UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

REGINA MELYNK,

    *Plaintiff*,

    v.

TEANECK BOARD OF EDUCATION,
BARBARA PINSAK, DENNIS HECK and
NAOMI CONKLIN,

    *Defendants.*

Civil Action No. 16-0188

OPINION

**THIS MATTER** comes before the Court on Defendants Teaneck Board of Education ("the School Board"), Barbara Pinsak, and Dennis Heck's motion to dismiss Plaintiff Regina Melnyk's ("Melnyk" or "Plaintiff") Complaint. Dkt. No. 8. The Court considered the motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. Defendant Naomi Conklin (together with the Board, Pinsak and Heck, "Defendants") joined in the motion. Dkt. No. 10. For the reasons stated below, Defendant's motion is **GRANTED**.

I. BACKGROUND

In this action brought under 42 U.S.C. §1983, Plaintiff Regina Melnyk alleges that Defendants violated her First and Fourteenth Amendment rights by disciplining her pursuant to an overbroad anti-harassment policy.

A. Plaintiff's Expressions

The underlying facts are undisputed. Regina Melnyk is a tenured teacher of Literature and Creative Writing at Teaneck High School, where she has been employed since September 2001. Compl. ¶¶ 9-10. On December 6, 2013, as part of the approved curriculum for her Creative Writing class, Melnyk led a class discussion of the essay "Six to Eight Black Men" by David Sedaris. Id.

¶ 12.  The essay concerns the Dutch holiday tradition of people dressing up the Zwarte Piete character, a black man, who accompanies Santa Claus.  Id. ¶ 13.  Melnyk, who is of Dutch ancestry, and still had relatives living in the Netherlands, told her class that this tradition still persists in the Netherlands.  Id. ¶ 14.  She showed them a picture on her cell phone of her relatives dressed in black face.  Id.  An African-American student, R.C., responded that she found the picture to be racist and offensive.  Id. ¶ 15.  Melnyk responded that it was more a reflection of "cultural differences."  Id. ¶ 16.  When the student reiterated that the picture was offensive, Melnyk responded "in defense of her family . . . that it was a culture difference," and that the Dutch had abolished slavery long before the United States.  Id. ¶ 17.

Later that day, R.C. reported these events to another teacher.  Id. ¶ 19.  The teacher then informed an Assistant Principal, who relayed it to Principal Dennis Heck.  Id. ¶ 20.  Heck then informed Superintendent Barbara Pinsak.  Id.  R.C. remained in Melnyk's class for the rest of the year.  Id. ¶ 18.

**B.  Defendant's Disciplinary Actions and Appeal**

Naomi Conklin, the Teaneck School District's anti-bullying specialist, was assigned to conduct a formal investigation to determine if Melnyk had violated the district's Harassment, Intimidation, and Bullying Policy (the "HIB Policy").  Id. ¶ 21.  After conducting interviews with R.C., Melnyk, a substitute teacher who was in her classroom at the time, R.C.'s other teacher, and Heck, Conklin issued a report on January 4, 2014.  Id. ¶ 23.  She found that Melnyk had displayed a picture that was "reasonably perceived as motivated by race or color," and that it "created a hostile environment for [the student]."  Id. ¶¶ 24-25.

On January 15, 2014, Barbara Pinsak informed Melnyk via letter that she was found to have violated the HIB Policy.  Id. ¶ 27.  The letter noted in particular that "[t]he depiction of your

relatives in 'black face' . . . is reasonably perceived as being motivated by race or color, took place in school, substantially interrupted the student(s) school day, and interfered with the rights of African-American students." Id. ¶ 28.  The consequence for this violation was a written reprimand to be placed in Melnyk's personnel file.  Id. ¶ 29.

Melnyk immediately sought to appeal the decision, but was advised that no right to appeal existed.  Id. ¶ 30.  She then filed a grievance under the collective bargaining agreement between her union and the School Board that went to binding arbitration.  Id. ¶¶ 31-32.  On January 31, 2015, the arbitrator found in favor of Melnyk, ordering the School Board to remove the written warning from her personnel file.  Id. ¶¶ 32.  On May 29, 2015, the New Jersey Superior Court confirmed the arbitrator's decision, ordering the School Board to remove the reprimand from Melnyk's file.  Id.

### C.  Anti-Harassment Policy

Teaneck Board of Education Policy #5512, under which Melnyk was charged, prohibits Harassment, Intimidation and Bullying, which is defined as:

> Any gesture, any written, verbal or physical act or any electronic communication as defined In N.J.S.A. 18A:37-14, whether it be a single Incident or a series of Incidents that: 1. Is reasonably perceived as motivated by either any actual or perceived characteristic, such as race, color, religion, ancestry, national origin, gender, sexual orientation, gender identity and expression, or a mental, physical or sensory disability; or by any other distinguishing characteristic; 2. Takes place on [s]chool property . . . as provided for in N.J.S.A. 18A:37-15.3; 3. Substantially disrupts or interferes with the orderly operation of the school or the rights of other students and that:
>
>> a. A reasonable person should know, under the circumstances, that the act(s) will have the effect of physically or emotionally harming at   student...or placing the student in reasonable fear of physical or emotional harm to his/her person or damage to his/her property; or
>> b. Has the effect of insulting or demeaning any student or group of students; or

c.    Creates a hostile educational environment for the student by interfering with a student's education or by severally or pervasively causing physical or emotional harm to the student.

Compl. ¶ 35; N.J.S.A. 18A:37-14.

### D.  Procedural History

Melnyk brought this action on January 12, 2016, alleging that Defendants' actions violated her First and Fourteenth Amendment rights.  Specifically, Melnyk asserts an as-applied First Amendment challenge to the School Board's anti-harassment policy, a facial First Amendment challenge, as well as a Fourteenth Amendment challenge that the anti-harassment policy violates due process.  Compl. ¶¶ 42-55.  Melnyk seeks monetary damages and injunctive relief declaring the HIB Policy null and void.  Id.  Defendants then moved to dismiss all counts.

## II.  LEGAL STANDARD

In considering a Rule 12(b)(6) motion to dismiss on the pleadings, the Court accepts as true all of the facts in the complaint and draws all reasonable inferences in favor of the plaintiff.  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008).  Dismissal is inappropriate even where "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits."  Id.  However, the facts alleged must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The allegations in the complaint "must be enough to raise a right to relief above the speculative level."  Id.  Accordingly, a complaint will survive a motion to dismiss if it provides a sufficient factual basis such that it states a facially plausible claim for relief.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

## III.  DISCUSSION

### A.  As-Applied First Amendment Challenge

Defendants first assert that Melnyk's as-applied challenge must be dismissed because her in-classroom expression was not protected speech under the First Amendment. Namely, she was not speaking on a matter of public concern. The Court agrees.

As a general rule, public employees "do not relinquish their First Amendment rights to comment on matters of public interest as a condition of their government employment." Brown v. Armenti, 247 F.3d 69, 74 (3d Cir. 2001) (citing Pickering v. Board of Education, 391 U.S. 563, 568 (1968)); see also Connick v. Myers, 461 U.S. 138, 142 (1983) ("[I]t has been settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression."). Likewise, teachers and students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines School District, 393 U.S. 503, 506 (1968).

However, states also have a paramount interest in regulating their own speech, or expression which may be construed as state-sponsored speech. The Supreme Court has noted that employers "have heightened interests in controlling speech made by an employee in his or her professional capacity. Official communications have official consequences." Garcetti v. Ceballos, 547 U.S. 410, 422 (2006); see also Miller v. Clinton County, 544 F.3d 542, 547 (3d Cir. 2008) ("[P]ublic employers . . . have the same concern for efficiency and the need to review and evaluate employees as any other employer in order to ensure that the actions of employees do not interfere with the performance of public functions."). As such, public employees' protected speech is limited to circumstances where an employee is speaking as a citizen on a matter of public concern. Id. at 417 (citations omitted). In a public school context, courts must balance "the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State,

as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568.

The Supreme Court has established a two-step inquiry to determine whether a public employee's speech is protected under the First Amendment. First, a court must determine whether the employee spoke as a citizen on a matter of public concern. If so, the court then uses a balancing test to ascertain whether the government entity had an "adequate justification" for treating the employee differently from a member of the general public. Garcetti, 547 U.S. at 418 (citing Pickering, 391 U.S. at 568); Munroe v. Central Bucks School Dist., 805 F.3d 454, 466 (3d Cir. 2015). These determinations are questions of law for the court. Baldassare v. State of N.J., 250 F.3d 188, 195 (3d Cir. 2001) (citing Waters v. Churchill, 511 U.S. 661, 668 (1994)). Here, Defendants assert that Plaintiff's speech was not on a matter of public concern.

1. Matter of Public Concern

"[S]peech implicates a matter of public concern when it can be fairly considered as relating to any matter of political, social or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." Munroe, 805 F.3d at 467 (internal quotations omitted). The content of speech on a matter of public concern "generally addresses a social or political concern of the community," including broad social or policy issues, speech that implicates the discharge of public responsibilities by a government agency, and speech that relates to the way in which a government office is serving the public. Borden v. School Dist. of Tp. of East Brunswick, 523 F.3d 153, 169-70 (3d Cir. 2008).

But content alone does not determine whether speech is a matter of public concern. A court must also consider the "form [ ] and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48. Courts may not "'cherry pick' something that may impact

the public while ignoring the manner and context in which that statement was made." Miller v. Clinton Cnty., 544 F.3d 542, 550 (3d Cir. 2008).   As such, courts have found that speech made in private forums is non-protected speech. See Borden, 523 F.3d at 171 (football coach's expressions made during invitation-only dinner and in closed locker room was not on matter of public concern because they were made in private "for the consumption of the football team only"); Miller 544 F.3d 550 (while content of probation officer's letter to county court judge included matters of public concern, the letter did not rise to the level of protected speech because it focused on the writer's personal grievances and was privately delivered in the form of a letter).

Taking form and context into consideration, courts have found that in-classroom speech made by an educator pursuant as part of a curriculum is not speech on a matter of public concern. See Edwards v. Cal. Univ. of Pa., 156 F.3d 488, 491 (3d Cir. 1998) ("a public university professor does not have a First Amendment right to decide what will be taught in the classroom"); Bradley v. Pittsburgh Bd. of Educ., 910 F.2d 1172, 1176 (3d Cir. 1990) ("Although a teacher's out-of-class conduct . . . is protected, her in-class conduct is not.") (internal citations omitted); see also Lee v. York Cnty. School Div., 484 F.3d 687, 700 (4th Cir. 2007) (under Pickering, a school board did not infringe the rights of a teacher when it ordered him to remove religious material from a classroom bulletin board); Miles v. Denver Public Schools, 944 F.2d 773 (10th Cir. 1991) (holding teacher's in-classroom comments about a rumor regarding two of his students was not protected speech, noting "we distinguish between teachers' in classroom expression and teachers' expression in other situations that would not reasonably be perceived as school-sponsored").

Here, Melnyk's speech fits squarely within the framework of non-protected, curricular speech.  Assuming the content of Melnyk's expressions implicated a public, social issue (the legitimacy of the Zwarte Piet tradition), the context in which she made it indicates the expression

is not a matter of public concern.  Melnyk was admittedly speaking as an employee when she commented on the Zwarte Piet tradition during the course of a classroom discussion.  Melnyk herself emphasizes that she was speaking as a teacher, and made the at-issue expressions "as part of the approved curriculum for her Creative Writing class."  Compl. ¶ 12.  As such, she was speaking as an agent of the school.  Mayer v. Monroe Co. Comm. Sch. Corp., 474 F.3d 477 (7th Cir. 2007) ("the school system does not regulate teachers' speech as much as it hires that speech"). Though Melnyk was not speaking from a school provided script, her improvised display of pictures from her phone and subsequent answers to her student's questions bore the imprimatur of the school as it took part during an authorized discussion.  Courts have noted a public school's significant interest in controlling its curriculum because the state may make content-based choice when acting as the speaker.  Edwards, 156 F.3d 488, at 491-92 ("when the state is the speaker, it may make content-based choices") (quoting Rosenberger v. Rector and Visitors of University of Virginia, 515 U.S. 819 (1995)); see also Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260, 273 (1988) ("[W]e hold that educators do not offend the First Amendment by exercising control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.").

In addition, Melnyk's expressions were made in a non-public setting.  Her classroom was a private forum engaged in the exclusive purpose of educating her students.  Public school classrooms, during school hours are typically regarded as non-public forums.  Busch v. Marple Newtown School Dist., 567 F.3d 89, 95 (3d Cir. 2009) ("[I]n classrooms, during school hours, when curricular activities are supervised by teachers, the nonpublic nature of the school is preserved.").  While public school classrooms are not per se private fora, they only become public when the school "intentionally open[s]" its facilities for "public discourse."  Hazelwood, 484 U.S.

at 267.  No such invitation was made here.  Plaintiff argues that the school created a "limited forum"[1] when it "approve[d] the presentation of a story and invites discussion about it by the teacher and students."  Pl.'s Br. at 9.  But this construction would render every public school classroom a limited public forum at all times.  This is inconsistent with courts' prior applications of the limited public forum doctrine.  Typically, a limited public forum is only found where a government entity has encouraged all members of a relevant community to participate.  See Kreimer v. Bureau of Police for Town of Morristown, 958 F.2d 1242, 1260 (3d Cir. 1992) (public library is limited public forum for purposes of reading, studying and using library materials because it is open to the public without discrimination); Rosenberger, 515 U.S. at 828-29 (school required to provide funding to all student clubs regardless of religious viewpoint).  Here, the only community member permitted to speak in the course of instruction was Melnyk, her student, and a substitute teacher who was observing the class.  Compl. ¶ 21.  Neither members of the public, nor even members of the school community in general were invited to participate. [2]

---

[1] A government entity may not discriminate based on viewpoint in a limited public forum. Rosenberger v. Rector and Visitors of University of Virginia, 515 U.S. 819, 828-29 (1995).

[2] Defendants argue that the Supreme Court's decision in Garcetti requires courts to first consider whether the public employee's speech was made pursuant to his official duties.  If it was, then his speech was not protectable and the inquiry ends.  Defs.' Br. at 6.  However, in Garcetti, the Supreme Court explicitly reserved the issue of "whether the analysis . . . would apply in the same manner to a case involving speech related to scholarship or teaching."  Garcetti, 547 U.S. at 425. While the Third Circuit has not explicitly adopted Defendants' proposed test in its post-Garcetti cases on speech made in the course of scholarship or teaching, it has conducted a similar inquiry by considering the context of the speech under Pickering.  See Munroe, 805 F.3d at 418 (3d Cir. 2015) (applying Pickering, teacher's comments on a personal blog was a matter of public concern because she made the blog available to the public and used it air grievances about the school); Borden v. School Dist. of Tp. of East Brunswick, 523 F.3d 153 (3d Cir. 2008) (under Pickering, football coach's participation in team prayer was not a matter of public concern because it occurred in a private locker room); compare Dougherty v. School Dist. of Philadelphia, 772 F.3d 979 (3d Cir. 2014) (applying Garcetti where teacher's expression was not made in the course of scholarship or teaching).  As such, regardless of the application of the proposed Garcetti test, Melnyk was not speaking as a citizen on a matter of public concern when she made the expression at issue.  See Borden, 523 F.3d at 171, n.13 (declining to apply Garcetti where speech failed first prong of the

2.  Academic Freedom

Finally, Melnyk urges the Court to consider "academic freedom" when deciding whether her First Amendment rights were violated.  She points to a case recognizing the significance of academic freedom in a university setting.  See Keyishan v. Bd. of Regents of Univ. of State of N.Y., 385 U.S. 589, 603 (1967) (academic freedom "is . . . a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom").  But university cases are inapposite.  It is well accepted that a state has a greater interest in regulating K-12 education than universities.  The Third Circuit has noted four key distinctions between public high schools and universities: (1) "the pedagogical missions of public universities and public elementary and high schools are undeniably different" because the latter prioritizes the inculcation of societal values while universities "encourage teachers and students to launch new inquiries into our understanding of the world; (2) public high school administrators have a responsibility to act in loco parentis; (3) public high schools face "special needs of school discipline"; and (4) public high school administrators must consider the maturity level of their young students.  McCauley v. Univ. of the Virgin Islands, 618 F.3d 232, 243-47 (3d Cir. 2010).

Because the Court finds that Melnyk expressions did not constitute speech on a matter of public concern, the Court does not consider the Pickering balancing test.

---

Pickering test).  If Garcetti applied to the instant matter, Melnyk's speech would not be protected as it was made within the scope of her employment as a teacher.  See Borden, 523 F.3d at 171, n.13 (even if Garcetti does apply in an educational context, a coach's participation in team prayer was not protected "as it was made pursuant to his official duties as a coach . . . and not as an ordinary citizen"); Johnson v. Poway Unified School Dist., 658 F.3d 954, 970 (9th Cir. 2011) (signs on a teacher's classroom walls identifying his religious affiliation not protected speech because it owed its existence to teacher's duties as an employee); Evans-Marshall v. Board of Educ. of Tipp City Exempted Village School Dist., 624 F.3d 332 (6th Cir. 2010) (public high school teacher's selection of texts for instruction was not protected speech because it was made pursuant to her duties as an employee).

**B. Facial Claim**

Defendants next argue that Melnyk's facial challenge to the School Board's must be dismissed because it is neither vague nor overbroad.  The Court agrees.

1. Overbreadth

Melnyk first asserts that the HIB policy at issue is facially overbroad.  The proper inquiry for an overbreadth challenge is whether the policy "prohibits a substantial amount of protected expression."  Ashcroft v. Free Speech Coalition, 535 U.S. 234, 244 (2002).  "Courts will not strike down a regulation as overbroad unless the overbreadth is "substantial in relation to the [regulation's] plainly legitimate sweep."  McCauley, 618 F.3d at 242 (3d Cir. 2010) (quoting Sypniewski v. Warren Hills Reg'l Bd. of Educ., 307 F.3d 243, 258 (3d Cir. 2002)).  The overbreadth doctrine is "strong medicine" that is only typically employed "only as a last resort." Los Angeles Police Dep't v. United Reporting Publ'g Corp., 528 U.S. 32, 39 (1999).  As such, "[e]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality."  Sypniewski, 307 F.3d at 259 (internal quotation omitted).

The Court looks to four factors to determine the breadth of a statute or policy: (1) "'the number of valid applications," (2) "the historic or likely frequency of conceivably impermissible applications," (3) "the nature of the activity or conduct sought to be regulated," and (4) "the nature of the state interest underlying the regulation.'"  Borden, 523 F.3d at 165 (citing Gibson v. Mayor & Council of Wilmington, 355 F.3d 215, 226 (3d Cir. 2004)).

Here, the HIB policy at issue prohibits any expression or conduct that "is reasonably perceived as being motivated by either any actual or perceived characteristic, such as race, color, religion, ancestry, national origin, gender identity, and expression, or a mental, physical or sensory disability; or by any other distinguishing characteristic."  Compl. ¶ 35.  Melnyk argues that the final clause of that provision, "by any other distinguishing characteristic" is overbroad.  Pl.'s Br.

at 11.  Specifically, she argues that there is no standard by which one could judge when speech derogatory as to some distinguishing characteristic.  This is an unreasonable construction of the policy.

On its face, the HIB Policy requires that several factors must be met before an expression can be found to be harassment.  First, the communication must be "reasonably perceived as motivated" by an actual or perceived characteristic.  That is to say, the comment must be objectively perceived to a reasonable person as motivated by a characteristic. Second, the communication must take place on school property.  Third, the expression must have the effect of "substantially" disrupting or "interfe[ring] with the orderly operation of the school or the rights of other students."  Finally, the expression must also have one of three effects: (1) the expression must be so objectively severe that "a reasonable person" should know that it will have the "effect of . . . emotionally harming" the student; or (2) that a student is actually insulted or demeaned; or (3) that a hostile work environment is created.  It is well established that schools may regulate speech that "would substantially disrupt school operations or interfere with the right of others."  Saxe v. State Coll. Area School Dist., 240 F.3d 200, 214 (3d Cir. 2001) (citing Tinker v. Des Moines Independent Comm. School Dist., 393 U.S. 503 (1969)).  This is precisely what the HIB Policy does.  It is difficult to think of any protected speech that would fall under this construction, and Melnyk has pointed to none.

Her only example plainly falls outside the scope of the policy.  Melnyk claims that under the policy, a health teacher would be chilled from teaching that a balanced diet includes meat for protein where a vegan student is in the class.  Pl.'s Br. at 12.   No reasonable person would find that a teacher's statement advocating eating meat for protein can be "perceived as motivated" by his student's vegan characteristic.  Even if one could find such a motive, the statement would also

need to cause substantial disruption or interference with the "orderly operation of the school or the rights of . . . students."  It is difficult to imagine how a discussion on the topic of protein diets could possibly lead to a disruption of the school or interference with the rights of any students.

Melnyk relies on the Third Circuit's ruling in <u>Saxe</u>, where the court struck down a public school district's anti-harassment policy for overbreadth.  240 F. 3d at 215.  However, the language of the School Board's policy here is markedly different.   The anti-harassment policy in <u>Saxe</u> provided that:

> Harassment means verbal or physical conduct based on one's actual or perceived race, religion, color, national origin, gender, sexual orientation, disability, or other personal characteristics, and which has the <u>purpose or effect</u> of substantially interfering with a student's educational performance or creating an intimidating, hostile or offensive environment.

> According to state law (18 Pa.C.S.A. § 2709), an individual commits the crime of harassment when, with intent to harass, annoy or alarm another person, the individual subjects, or attempts or threatens to subject, the other person to unwelcome physical contact; follows the other person in or about a public place or places; or behaves in a manner which alarms or seriously annoys the other person and which serves no legitimate purpose.

<u>Id.</u> at 218 (emphasis added).

 It went on to define types of harassment in a definitions section.  For example, "racial or color harassment" was defined as including "unwelcome verbal, written, or physical conduct directed at the characteristics of a person's race or color . . . ." <u>Id.</u> at 220. There, the Third Circuit first noted that the policy exceeded what is constitutionally permissible under <u>Tinker</u> by not only prohibiting speech that led to actual interference of a student's educational environment, but also speech that was merely made with <u>the purpose</u> of causing such disruptions.  <u>Id.</u> at 217.  Second, the court noted that even if the "purpose" language was ignored, the examples of prohibited "harassment" contained in the policy do not rise to the level of substantial disruption.  <u>Id.</u>  Third,

the Saxe policy prohibited speech that either had the purpose or effect of creating substantial interference or created a hostile educational environment.  Id.

The HIB Policy contains none of these flaws.  First, it only prohibits speech that actually causes substantial interference.  Second, it does not prohibit harassment as "unwelcome" communication, but as communication "reasonably perceived" as motivated by a characteristic. Third, it can also prohibit speech that creates a hostile educational environment, but only if the speech creates a substantial interference with students' educational rights first.  In short, the HIB Policy falls within the Tinker test.  Accordingly, the Court finds that the valid number of applications is limited to speech that would be offensive to a reasonable person.

The Court also finds that the third and fourth Gibson factors weigh heavily in favor of Defendants' position.  As discussed above, the Third Circuit has consistently recognized a public grade school's interest in regulating the classroom environment, especially any speech that "substantially disrupts" the orderly operation of the school.  See McCauley, supra, (outlining the special circumstances of a public grade school environment including the public school's duty to act in loco parentis, "special needs of school discipline," and students' maturity level).

The Court finds that, on balance, the Gibson factors favor a finding that the HIB policy is not overbroad.

2.  Vagueness

"A statute is unconstitutionally vague when 'men of common intelligence must necessarily guess at its meaning.'"  Borden, 523 F.3d at 167 (quoting Broadrick v. Oklahoma, 413 U.S. 601, 607 (1973)).  The inquiry is conducted on a case-by-case basis.  Id.  A plaintiff bears the burden of showing that the statute was vague as applied to him.  Id.

Melnyk argues that the HIB Policy is vague because it is "'victim' determinative"—that is to say, whether or not a violation occurs is based on the victim's perception of the expression. Compl. ¶ 55.  This construction of the statute is misplaced.  As explained <u>supra</u> II, B, 1, the HIB Policy requires that several objective factors be met before expression is found to rise to the level of prohibited harassment.  The expression must be "reasonably perceived" as motivated by an actual or perceived characteristic.  It must also cause substantial disruption or interference of the school's orderly operation or students' rights.  The "reasonably perceived" test is an objective one that has withstood constitutional scrutiny.  For example, in the copyright context, the Supreme Court has applied the "reasonably perceived" test to determine whether work constitutes a non-infringing parody.  <u>See</u> <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569, 582 (1994) (where a defendant presents a parody defense, the relevant inquiry is "whether a parodic character may be reasonably perceived").  Similarly, whether activity at a public school implicates the Establishment Clause turns on if the activity is "reasonably perceived" to have been endorsed by the school. <u>Busch v. Marple Newtown School Dist.</u>, 567 F.3d 89, 99 (3d Cir. 2009).[3]

Melnyk relies on <u>State v. Pomianek</u>, where the New Jersey Supreme Court found that a provision of the state's criminal bias-intimidation statute was vague because it required that a defendant who did not belong to a particular ethnic or racial group predict the reaction of a reasonable member of that group.  221 N.J. 66, 90 (2015).  However, the statute there was

---

[3] Defendants argue the HIB Policy is not vague because it only prohibits speech that "a reasonable person should know, under the circumstances," would have harmful effects on a victim.  Defs.' Br. at 49.  Defendants' reading is too narrow.  Defendants take this language from subsection A of the statute.  However, subsection A must be read disjunctively with subsections B and C.  Thus, assuming that subsections 1-3 are met, a violation of any subsection A through C would constitute a violation of the HIB Policy.

explicitly focused on the victim's perspective.  It provided that a person was guilty of bias intimidation if he committed certain prohibited acts:

> under circumstances that <u>caused any victim of the underlying offense to be intimidated and the victim</u>, considering the manner in which the offense was committed, reasonably believed either that (a) the offense was committed with a purpose to intimidate the victim or any person or entity in whose welfare the victim is interested because of race, color, religion, gender, disability, sexual orientation, gender identity or expression, national origin, or ethnicity, or (b) the victim or the victim's property was selected to be the target of the offense because of the victim's race, color, religion, gender, disability, sexual orientation, gender identity or expression, national origin, or ethnicity.

<u>Id.</u> at 81 (emphasis added).  The statue required inquiry into whether the victim—and the victim alone—reasonably perceived a defendant's actions as conducted with a motive to intimidate based on a protected characteristic of the victim.  In contrast, the HIB Policy does not require a speaker to place himself in the shoes of a recipient.  It prohibits expression that any reasonable person would perceive as being motivated by protected characteristic.

One component of the HIB Policy that relies more on the victim's perspective is subsection B, which prohibits language that "[h]as the effect of insulting or demeaning any student or group of students."  Taken alone, this could arguably lead to a ban of any expression that insults just one student.  However, this provision must be read in conjunction with the rest of the HIB Policy, which requires that the expression be "reasonably perceived" as motivated by a characteristic and cause substantial disruption or interference.

### C. Due Process

Melnyk argues that the HIB Policy violated her due process rights.  In the context of school district policies, the Third Circuit applies the same test for vagueness to a procedural due process claim.  <u>Borden</u>, 523 F.3d at 173.  "[A] rule prohibiting conduct must not be in terms so vague that people of common intelligence must guess as to its meaning."  <u>Id.</u> (internal quotation omitted).  As

discussed above, the Court finds that the HIB Policy is not unconstitutionally vague.  Without such a finding, a plaintiff "must point to a fundamental right that he has which the policy infringed upon in order to establish a due process violation."  Id. at 173-74.  Melnyk has not done so here.  She argues that her Equal Protection rights were violated because the HIB Policy "permits school administrators to subjectively create a class of favored speakers who are deemed politically correct and another class who [are] deemed bullies because their speech maybe politically incorrect."  Compl. ¶ 56.

Under the Equal Protection clause of the Fourteenth Amendment, a government entity "may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views."  Police Dept. of City of Chicago v. Mosley, 408 U.S. 92, 96 (1972) (ordinance regulating speech on school property resulted in viewpoint discrimination where protestors about racial discrimination were treated worse than other protestors).  As such, the Court must first determine the nature of the relevant forum.  See OSU Student Alliance v. Ray, 699 F.3d 1053, 1062 (9th Cir. 2012) (university practiced viewpoint discrimination where it selectively destroyed copies of a conservative newspaper).  Here, the forum is a non-public classroom.  For reasons discussed above, a public high school is free to regulate school-sponsored speech made during the course of regular classroom use.  See supra, III A. Accordingly, Melnyk's Equal Protection claim is dismissed.

Having found that the application of the HIB Policy did not violate Melnyk's First Amendment or Fourteenth Amendment rights, the Court does not reach the issue of qualified immunity as against individual Defendants.

**IV. CONCLUSION**

For the reasons set forth above, Defendants Teaneck Board of Education ("the School Board"), Barbara Pinsak, Dennis Heck, and Naomi Conklin's motion to dismiss, Dkt. No. 8, is **GRANTED**.  An appropriate Order accompanies this Opinion.

**Dated: November 22, 2016**

*/s Madeline Cox Arleo*
**Hon. Madeline Cox Arleo**
**UNITED STATES DISTRICT JUDGE**